1
2
3
4
5
6
7

**United States District Court**
For the Northern District of California

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10          OAKLAND DIVISION

11

12   DANIEL MILLER,                          Case No. 14-1975 JSW (PR)

13            Petitioner,                     **ORDER DENYING PETITION FOR
                                              WRIT OF HABEAS CORPUS**
14      v.

15   FRED FOULK, WARDEN

16            Respondent.

                                     /

17

18                          **INTRODUCTION**

19          Petitioner, Daniel Miller, a prisoner of the State of California filed a *pro se* petition

20   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his

21   criminal conviction and sentence in state court.  Respondent filed an answer to the petition,

22   to which Petitioner filed a traverse.  For the reasons set forth below, the petition is DENIED.

23                          **BACKGROUND**

24          In 2010, a Santa Clara County jury convicted Petitioner and co-defendant, Eddie

25   James Sample, of first-degree murder.  *See* Cal. Penal Code §§ 187-189.  The trial court

26   sentenced both Defendants to a term of twenty-five years to life in state prison.

27          In 2013, the California Court of Appeal affirmed the trial court's decision in an

28   unpublished opinion.  Petitioner appealed this decision to the California Supreme Court,

**United States District Court**
For the Northern District of California

1   which denied review on January 15, 2014.  On April 29, 2014, Petitioner filed the instant

2   petition under 28 U.S.C. § 2245.

3        The California Court of Appeal summarized the evidence presented at trial as

4   follows:

5        **The Prosecution's Case**

6

7            **The Charged Offense**

8            In the early evening on January 25, 2006, Alfonso Neri walked from a
    friend's house in San Jose to a nearby market. On the way back, he noticed a
9   man he had seen in the market walking ahead of him on South 22nd Street.
    Two other men, one on foot and one on a bicycle, seemed to be following the
10  man. The followers stopped behind a trailer to talk, but Neri's limited English
    kept him from understanding what they said.
11

12           Neri saw the man on the bicycle ride in front of the man from the store,
    blocking his path. A few seconds later, the other man ran over and "beat [the
13  victim] up with a bat." From his vantage point directly across the street, Neri
    saw the man with the bat hit the victim in the head "[a]bout seven times," and
14  he heard "[a]bout five or six" additional blows. Neri saw the man on the
    bicycle strike and kick the victim. The attackers fled, and Neri saw the victim
15  "try to get up and try to walk, but he couldn't."

16           Neri returned to his friend's house, and his friend called 911.
    Responding officers found a pool of blood and a few blood drops at the scene,
17  but they were unable to locate a victim.

18

19           Later that night, different officers responded to a report of a man acting
    strangely in the driveway of a house three-quarters of a mile from where the
20  attack occurred. They found Jorge Trujillo trying to break into a parked car
    with a garden rake. When he stared blankly at them and failed to respond to
21  repeated commands, Trujillo was tased, wrestled to the ground, and taken into
    custody. "Once they had him in custody they made the connection between the
22  assault and the current case ... and sent him to the hospital." Trujillo died the
    next day.

23

24           Police canvassed the area where the attack occurred. Gilbert Godinez
    reported hearing "like two sticks banging," and "all of a sudden ... like three to
25  four guys come running ... from the scene...." Godinez saw Trujillo struggle to
    get up, then limp away. Neri initially denied knowledge of the attack but
26  eventually admitted having seen it. With Neri's assistance, a police artist made
    a sketch of the attacker on the bike.

27

28

2

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Months later, the investigation had narrowed to focus on defendants, their friend Jason Garewal, and brothers Richard Torres and Emmanuel Flores. In October 2006, police obtained recent photos of Sample and Miller, and Neri positively identified both from photo lineups. "This looks like him, the kid on the bike," he said in selecting Miller's photo. "This is the one with the bat," Neri said in selecting Sample's photo. "He was holding the bat behind his back, and then he came up and hit the guy on the head."

In November 2006, police obtained an order approving wiretaps on defendants' phones. To stimulate conversation, they interviewed Torres's and Miller's girlfriends, Garewal, and later, Miller and Sample. In intercepted conversations, defendants placed themselves at the scene of the attack and spoke about sticking to the story they and their friends had agreed upon. In a December 11, 2006 conversation, Garewal informed Sample that police had told him not to worry because the investigation was focused more on his friends than on Garewal. Sample responded, " 'I may have to run.' " Sample and Miller were arrested for the murder two days later.

Torres was arrested for the murder in April 2007. He initially denied knowledge of the attack. In November 2007, he agreed to plead guilty to an accessory-after-the-fact (§ 32) count in exchange for a prison sentence of no more than 36 months. The agreement was conditioned on his testifying fully and truthfully at trial.

Torres testified that on the day of the murder, he, defendants, Garewal, and Flores smoked marijuana at a school and decided to pawn Flores's Xbox for more marijuana. The group walked to the brothers' house, and defendants and Garewal waited in a shed and then by the front gate while Torres and Flores went into the house. When Torres and Flores came out with the Xbox, Torres saw Miller block Trujillo's path with his bike as Sample ran up and hit Trujillo in the head with a bat. When Trujillo "dropped," Sample bent down and hit him four or five more times with his fists, and Miller kicked and punched Trujillo. Torres ran toward them, shouting, "What the fuck?" The attack stopped, Sample picked up the bat, and all five "took off" running toward a nearby Wienerschnitzel. Defendants and Garewal got into a car driven by Miller's brother, and Torres and Flores "did the [Xbox] transaction."

When the five met the next day, Torres asked "what it was about," and Sample said, "[t]he guy was a scrap [a derogatory Norteño word for Sureños] so we beat him up." A week later, Sample told Torres he had gotten rid of the bat, and all agreed "[n]ot to say nothing" about the attack. After that, Torres "disappeared."

Godinez and Neri also testified for the prosecution. Neri told the jury the attack was something he would "[n]ever" forget. He was "scared," but he had been truthful and as accurate as possible in all of his interactions with police.

Homicide detective Brian Ferrante and other officers described the investigation. Police captain Meynard Gamez described Neri's positive identifications of defendants from the October 2006 photo lineups.

**United States District Court**
For the Northern District of California

1

2

3

4

       Dr. Victor Tse, a board-certified neurosurgeon at Valley Medical Center in San Jose, testified as an expert in head trauma. Trujillo arrived in the emergency room around 9:56 p.m. on January 25, 2006, and CT scans revealed multiple skull fractures. Dr. Tse diagnosed severe head trauma with no blood flow to the brain, and he pronounced Trujillo brain dead the next day. Trujillo's injuries were consistent with blunt force trauma.

5

6

7

8

9

10

11

12

13

14

       Dr. Michelle Jordan, a board-certified pathologist employed as an assistant medical examiner for Santa Clara County, testified as an expert in pathology, neuropathology, forensic pathology, and taser-related deaths. Since she had not attended the autopsy, Dr. Jordan based her testimony on autopsy photographs taken by crime scene investigator Tom Schnutenhaus and on her review of Trujillo's medical records. The photos revealed three separate skull fractures as well as comminuted skull fractures—"essentially, that the skull is just like a broken eggshell." Dr. Jordan also pointed out "very large, jagged lacerations," one of which "approach[ed] 1.5 inches in depth." Other photos showed subgaleal hemorrhage indicative of "massive head trauma" and "significant subarachnoid hemorrhage" indicative of severe blunt force trauma. These were "significant" injuries, and any one was sufficient to cause Trujillo's death. Trujillo's head injuries were consistent with someone being hit with a bat. Dr. Jordan opined that Trujillo died from blunt force trauma to the head caused by an assault, that he could not have survived his injuries, and that tasing had "nothing to do with" his death.

### The Defense's Case

15

16

17

18

19

20

21

       The defense theory was that Neri's identifications were "questionable" and that Torres was a "gangster" who was "lying" to avoid a life sentence. Recalled to the stand, Torres confirmed that he had been released shortly after he testified and was awaiting sentencing pursuant to his plea agreement. Nelia Matos, who lived "right across the street" from Torres's former residence on South 22nd Street and had dated him "for a bit," testified that she had seen Torres outside, wearing baggy black and red clothing, on the evening of the attack. Ferrante was recalled for questioning about the extent of his investigation into Torres's "gang connections," and he and officer Daniel Ichige were questioned about the photo lineups shown to Neri.

22

### Verdicts and Sentencing

23

24

       A jury convicted defendants Eddie James Sample and Daniel Miller of first degree murder (Pen.Code, § 187), and the trial court sentenced both to 25 years to life in prison.

25

26

*People v. Sample*, 2013 WL 5460190, 1-3 (Cal. Ct. App. Oct. 1, 2013).

27

//

28

//

4

**United States District Court**
For the Northern District of California

1

**STANDARD OF REVIEW**

2      A district court may not grant a petition challenging a state conviction or sentence on

3  the basis of a claim that was reviewed on the merits in state court unless the state court's

4  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

5  unreasonable application of, clearly established Federal law, as determined by the Supreme

6  Court of the United States; or (2) resulted in a decision that was based on an unreasonable

7  determination of the facts in light of the evidence presented in the State court proceeding."

8  28 U.S.C. § 2254 (d).  The first prong applies to both questions of law and to mixed

9  questions of law and fact, *Williams (Terry) v. Taylor,* 529 U.S. 362, 407-09 (2000), while

10  the second prong applies to decisions based on factual determinations.  *Miller-El v.*

11  *Cockrell*, 537 U.S. 322, 340 (2003).

12      A state court decision is "contrary to" Supreme Court authority, that is, falls under

13  the first clause of § 2254 (d)(1), only if "the state court arrives at a conclusion opposite to

14  that reached by [the Supreme] Court on a question of law or if the state court decides a case

15  differently that [the Supreme] Court has on a set of materially indistinguishable facts."

16  *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

17  of" Supreme Court authority, falling under the second clause of § 2254 (d)(1), if it correctly

18  identifies the governing legal principle from the Supreme Court's decisions, but

19  "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The

20  federal court on habeas review may not issue the writ "simply because the court concludes

21  in its independent judgment that the relevant state-court decision applied clearly established

22  federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be

23  "objectively unreasonable" to support granting the writ.  *Id.* at 409.

24      Under 28 U.S.C. § 2254 (d)(2), a state court decision "based on a factual

25  determination will not be overturned on factual  grounds unless objectively unreasonable in

26  the light of the evidence presented in the state-court proceeding."  *Miller-El,* 537 U.S. 332 at

27  340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

28

**United States District Court**
For the Northern District of California

1   When there is no reasoned opinion from the highest state court to consider AEDPA's

2   standard for relief has been met, the Court looks to the last state court to deny the claims in

3   an explained opinion. *See Ylst v. Nunnemaker,* 501 U.S. 797, 801-06 (1991).  For the claims

4   discussed below, the last explained state court opinion is the California Court of Appeal's

5   affirmance on direct appeal.

6                                              **DISCUSSION**

7   Petitioner claims that: 1) the trial court's refusal to admit a portion of Petitioner's

8   police interview violated his federal due process rights to present a complete defense and to

9   a fair trial, as well as his rights under the Confrontation Clause, 2) the trial court's refusal to

10  admit a portion of Sample's police interview violated Petitioner's federal due process rights

11  to present a complete defense and to a fair trial, and 3) the cumulative effect of the errors so

12  infected the trial with unfairness that Petitioner was denied due process.

13  I.      Exclusion of Petitioner's Testimony

14  Petitioner claims that his federal due process rights to present a complete defense

15  and to a fair trial, as well as his rights under the Confrontation Clause, were violated when

16  the trial court excluded the portion of his police interview in which Petitioner stated he

17  watched Torres and Sample attack the victim.

18  The background to this claim was explained by the California Court of Appeal as

19  follows:

20          Interviewed by police on the day of his arrest, Miller initially denied
    having been at Torres's house or downtown with him in January 2006. He
21  eventually admitted taking "a very long walk" downtown with Torres and
    others to pick up an Xbox to sell. They walked to a house that Torres said was
22  his mother's or his aunt's. Behind it was a "little shack thing" that Torres said
    was his room. They waited there for "about five minutes" while Torres went
23  into the house. The room "smelled," and when Torres came back, "we said we
    wanted to leave." Torres called someone about buying the Xbox "but they
24  didn't wanna buy it no more."

25          In the second part of the interview, which followed a break in the
    questioning, Miller told police that he and his friends had walked "for a little
26  bit" after leaving Torres's house "[a]nd then there was this guy and [Torres] ran
    up to him or something." Miller "was watching the whole time" as Torres beat
27  the victim with a bat and Sample kicked or punched him. Torres and Flores
    went home, and Miller, Sample, and Garewal called Miller's brother for a ride
28  and "got picked up at Wienerschnitzel's."

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On learning that the People planned to introduce the first part of the interview, Miller moved in limine to admit the second part (Evid. Code, § 356), arguing that the "small and misleading" first part created the "clear" impression that he "was present" during the attack but was being "evasive" or "lying" to the police "about what occurred at this time and place and his role in those activities." Focusing on Miller's statement that after leaving Torres's house, the group went to the Wienerschnitzel and called Miller's brother for a ride, Miller's counsel argued that including that statement left "a gap" because "we are talking about a period of time when the implication is [that Miller] saw nothing." After the People agreed to redactions eliminating that gap, the court denied the motion.

On several subsequent occasions, Miller asked the court to admit the second part of the interview based on Evidence Code section 356, *Aranda–Bruton*, *People v. Aranda*, 63 Cal.2d 518 (1965); *Burton v. U.S.*, 391 U.S. 123 (1968), and/or his right to effectively cross-examine Torres. The court denied those requests, and the audio recording of the first part of Miller's police interview was played for the jury.

*Sample*, WL 5460190 at 13.

The California Court of Appeal denied Petitioner's claim based on the following:

Miller contends that the second part of his police interview "had to be admitted" to dispel "the obvious inference that he had not only denied involvement but had denied being present" during the assault on Trujillo. We disagree.

Evidence Code section 356 provides that "[w]here part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." (Evid.Code, § 356.) " 'The purpose of this section is to prevent the use of selected aspects of a conversation ..., so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which "have some bearing upon, or connection with, the admission ... in evidence." ' " (*People v. Williams* (2006) 40 Cal.4th 287, 319 (*Williams*).) Parts of an interview that do not clarify or explain the parts that were admitted, however, may be excluded in the court's discretion. (*Ibid.*; *People v. Williams* (1975) 13 Cal.3d 559, 565 [although hearsay is not a valid objection to the admission of parts of an interview under Evidence Code section 356, "[s]ection 356 is indisputably ' "subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced." ' [Citations.]"].)

Here, Miller's assertion in the second part of the interview that he merely watched Torres and Sample attack Trujillo had no " ' "bearing upon, or connection with," ' " his statement in the first part of the interview that he and others went to Torres's house to pick up an Xbox that Torres planned to sell. (*Williams*, supra, 40 Cal.4th at p. 319.) Although both statements arguably related to the same subject (broadly defined as anything that happened in the

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

vicinity of Torres's residence that January night), the second part of the interview was not "necessary to make [the first part of the interview] understood...." (Evid.Code, § 356; *People v. Gambos* (1970) 5 Cal.App.3d 187, 192–193 (*Gambos* ).) The time gap that Miller claimed made the first part of the interview "misleading" had been eliminated by redaction, and the first part of the interview as redacted was independently comprehensible. (See *People v. Barrick* (1982) 33 Cal.3d 115, 131 & fn. 4 (*Barrick* ) [post-arrest statement would have been admissible if necessary to understand earlier pre-arrest statement, but earlier statement was found independently comprehensible], superseded by statute on another ground as stated in *People v. Collins* (1986) 42 Cal.3d 378, 393; see also *People v. Farley* (2009) 46 Cal.4th 1053, 1103 (*Farley* ) ["the trial court did not abuse its discretion in concluding that the proffered letters were not 'necessary' to the jury's understanding of the letters introduced by the prosecution ... [but were instead] 'independently comprehensible' on the relevant topics of defendant's premeditation and intent to kill."].) Accordingly, the trial court did not abuse its discretion in excluding the second part of Miller's interview as unnecessary to make the first part of the interview understood.[] (Evid.Code, § 356.)

Miller next argues that the second part of the interview was necessary to make Ferrante's[1] testimony about a recorded telephone call (in which Miller and Sample discussed the police sketch) understood—i.e., to dispel an inference that Miller never denied involvement in the attack. We disagree. The colloquy was not misleading because the question was plainly limited to that particular recorded telephone conversation: "And neither one of the individuals *in that phone call*, either Eddie Sample or Daniel Miller, ever denied being involved in the murder?" (Italics added). "*Not in the phone call, no*," Ferrante responded. (Italics added. ) Because the question and answer were independently comprehensible, the second part of Miller's interview was not necessary to clarify or explain them. (See *Barrick*, supra, 33 Cal.3d at p. 131 & fn. 4; *Farley*, *supra*, 46 Cal.4th at p. 1103.)

Miller next argues that the court's "repeated rulings" violated his constitutional right to present a complete defense and denied him a fair trial by "preventing [him] from dispelling the innuendos that he had lied to the police and that he was protecting his co-defendant." The argument lacks merit. There were no innuendoes to dispel once the first part of the interview was redacted—the misleading time gap had been eliminated, only Miller and Torres were referred to by name, and pronouns and other neutral terms (e.g., "you guys") were used to refer to the entire group or some subset of the five present that night.

Miller next argues that the exclusion of the second part of the interview denied him due process. We reject the contention. "As a general matter, the '[a]pplication of the ordinary rules of evidence ... does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103; *People v. Lucas* (1995) 12 Cal.4th 415, 464–465 (*Lucas* ) [rejecting claim that the exclusion of hearsay evidence amounted to a denial of due process].) Here, there was no basis for admission of the second part of Miller's interview. As previously discussed, it was not admissible under Evidence Code section 356 because the first part of the interview was independently comprehensible. (See *Barrick*, *supra*, 33 Cal.3d at

---

[1]Homicide detective Brian Ferrante

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

p. 131 & fn. 4; *Farley*, *supra*, 46 Cal.4th at p. 1103.) With Evidence Code section 356 unavailable as a basis for admission, the second part of the interview was hearsay to which no exception applied. (Evid.Code, § 1200; see *Gambos*, *supra*, 5 Cal.App.3d at p. 192.) As such, it was properly excluded. Defendant's due process rights were not violated by exclusion of the second part of the interview. (*Lucas*, at pp. 464–465; see *People v. Gurule* (2002) 28 Cal.4th 557, 605 ["The 'fuller picture' defendant argues should have been presented to the jury consisted of self-serving hearsay not otherwise admissible at trial. [Citation.] Defendant was free to present this information by taking the stand himself."].)

Miller next contends that he was "prevented ... from effectively cross-examining Torres by presenting the argument that [Torres] was lying and was implicating [Miller] only after the police had informed [Torres] that [Miller] had said that it was he, Torres, who had hit the victim with a bat." We disagree.

When Miller raised this issue below, Sample's counsel protested that admitting Miller's self-serving exculpatory assertion under the guise of effective cross-examination would violate Sample 's right to confrontation, because Miller's statement that Torres and Sample were the attackers would come in without Miller having to explain it on the stand. The trial court ruled that the defense would be permitted to cross-examine Torres about his motivations for changing his story, but Miller's counsel would not be permitted to get into the details of what Miller had told police about his own claimed lack of participation in the assault. "[B]ased on rulings I've previously made regarding the statements of both defendants, ... *Aranda/Bruton* issues, Evidence Code 356 issues," the trial court explained, "I don't see this as an alternate avenue of getting before the jury [Miller's] self-serving obviously exculpatory statements. [¶] What the Court feels is relevant and probative is ... [that] Mr. Torres testified on direct [that] he was aware that both defendants had implicated him in the assault ..., and that that was a factor in his decision to give a statement to police and to testify. [¶] ... [¶] So, I'm going to limit [the] defense to being able to ask questions using wording such as, 'implicated in the participation of the assault on Mr. Trujillo.' But nothing more than that."

Following this ruling, both defense counsel vigorously cross-examined Torres about his motivation for testifying, and Torres testified that he had been "tripped out" to learn *that [Sample and Miller] were saying that I was the one that did it.*" (Italics added.) Miller's counsel emphasized this response: "*And in fact the information that you got from the police back in April is that both the guys said that you did it* ; is that correct?" (Italics added.) Torres responded affirmatively, and he was then thoroughly cross-examined on whether he knew that his murder charge carried a 25 years to life sentence, whether his lawyer had told him he "could be in there the rest of [his] life" since "people as a whole don't get paroled on that kind of a charge," whether he was worried about that, whether he was angry that Sample and Miller had "ratted" him out, and whether he wanted the murder charge against him dropped in exchange for his testimony. In sum, Torres himself told the jury what Miller contends he was precluded from asking about. Miller's assertion that "[a]ll the jury heard was that at some point Miller (and also Sample) had somehow implicated Torres in the beating" is simply incorrect. Miller's right to effectively cross-examine Torres was not violated.

*Sample*, WL 5460190 at 13-14.

9

1        A.      Due Process

2        In deciding whether the exclusion of evidence violated the due process right to a fair

3   trial or to present a defense, the court balances the following five factors: 1) the probative

4   value of the excluded evidence on the central issue; 2) its reliability; 3) whether it is capable

5   of evaluation by the trier of facts; 4) whether it is the sole evidence on the issue or merely

6   commutative; and 5) whether it constitutes a major part of the attempted defense. *Chia v.*

7   *Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th

8   Cir. 1985)).  The court must also give due weight to state interests underlying the state

9   evidentiary rules on which the exclusion was based. *See Id.* at 1006; *Miller*, 757 F.2d at 955.

10       The exclusion of a portion of Petitioner's police interview by the state courts was

11  reasonable, and did not violate Petitioner's due process rights under *Miller*.  First, the

12  excluded evidence offered minimal probative value to the central issue of the case.  The

13  excluded evidence was uncorroborated and self-serving hearsay.  It was also unnecessary to

14  explain either the admitted portion of the interview or Ferrante's testimony, as explained

15  above by the California Court of Appeal.

16       Secondly, the excluded evidence was unreliable.  When Petitioner was initially

17  interviewed by the police, he denied being in the area when the crime occurred.  Petitioner

18  eventually changed that statement, and admitted to being present during the attack on the

19  victim.  By initially lying to the police, Petitioner undermined his own credibility.

20       Third, if Petitioner's evidence had been introduced, the trier of fact would have been

21  prevented from evaluating the statement's validity.  Petitioner would have been able to

22  introduce his statement without testifying, preventing Respondent from cross-examining and

23  disproving, discrediting, or creating doubt as to the validity of the statement.  Without a

24  proper cross-examination, the trier of fact would not have been able to assess Petitioner's

25  possible biases or credibility in giving the statement.

26       Lastly, the excluded evidence was neither the sole evidence offered on the issue at

27  trial nor was it a major part of Petitioner's defense.  On cross-examination of Torres,

28  Petitioner elicits testimony from Torres that Petitioner identified Torres as the killer.

10

United States District Court

For the Northern District of California

1   Respondent also provided two eye witnesses to provide evidence on the issues at trial.

2   Further, the trier of fact already knew that Petitioner denied committing the crime because

3   Petitioner pled not guilty and was undergoing a trial.

4          Under *Miller* the exclusion of evidence did not violate Petitioner's due process rights

5   to present a defense or to a fair trial.  The state court's decision on this issue was a

6   reasonable application of federal law.

7          B.     Confrontation Clause

8          Petitioner argues that the exclusion of his police interview prevented him from

9   effectively cross-examining Torres and Ferrante.  The Confrontation Clause of the Sixth

10  Amendment provides that in criminal cases the accused has the right to "be confronted with

11  the witnesses against him."  U.S. Const. Amend. VI.  The Confrontation Clause guarantees

12  an opportunity for effective cross examination, not cross examination that is effective in

13  whatever way, and to whatever extent, the defense might wish.  *Delaware v. Fensterer*, 474

14  U.S. 15, 20 (1885).  In *Van Arsdall*, the Court stated, "trial judges retain wide latitude

15  insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross

16  examinations based on concerns about, among other things, harassment, prejudice,

17  confusion of the issues, the witness safety, or interrogation that is repetitive or only

18  marginally relevant."  *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

19          1.     Torres

20          The exclusion of a portion of Petitioner's police interview did not prevent Petitioner

21  from effectively cross-examining Torres.  Petitioner was still able to question Torres about

22  his possible motivations and biases.  Specially, Petitioner questioned Torres about whether

23  knew that both Petitioner and Sample had identified Torres as the one who committed the

24  murder.  Petitioner also questioned Mr. Torres about "whether he was angry that Sample and

25  Petitioner 'ratted' him out," and "whether he wanted the murder charge against him dropped

26  in exchange for his testimony.*"  Sample,* WL 5460190 at 14.  Thus, trier of fact had

27  sufficient information to assess Torres' credibility as a witness even without the excluded

28  evidence.  There is no violation of the Confrontation Clause.  *See*, *e.g.*, *Evans v. Lewis*, 855

11

1   F.2d 631, 633-34 (9th Cir. 1998) (no Confrontation Clause violation where trial court

2   restricted cross examination of prosecution's witness whose bias and motivation had clearly

3   been established and the evidence sought to be introduced was only cumulative on issue of

4   credibility).

5                               2.      Ferrante

6          There was also no Confrontation Clause violation with respect to Ferrante because

7   the evidence that was excluded concerned distinct events from Ferrante's testimony, and as

8   a result the evidence would have only confused the issues for the jury if introduced during

9   Ferrante's cross-examination.

10         The excluded evidence was a portion of Petitioner's police interview in which he

11  discussed the events on the day of the murder, including the murder itself.  Ferrante did not

12  testify about those events.  Rather, he testified about a phone conversation between

13  Petitioner and Sample from before their arrest in which they discussed a police sketch.  On

14  cross-examination, Ferrante was asked whether Petitioner or Sample denied their

15  involvement in the murder.  Ferrante stated that the issue of their involvement in the murder

16  was not discussed during their phone conversation.

17         While Ferrante's testimony and Petitioner's police interview are connected to the

18  overall issue of whether Petitioner was the murderer, they are not otherwise related.

19  Ferrante discussed a phone call that happened some time after the murder and before

20  Petitioner's arrest, and did not discuss Petitioner's police interview or the events of the day

21  of the murder.  Petitioner's later denial of being involved in the murder, after having been

22  arrested, does not explain or clarify why he did not deny his involvement in the murder

23  during his earlier phone conversation with Sample in which they discussed the police

24  sketch.  The phone conversation and the police interview do not explain or illuminate each

25  other.  As a result, evidence of the police interview during cross-examination about the

26  phone call would have only confused the issues for the jury.  Petitioner was still afforded an

27  opportunity to cross-examine Ferrante concerning the phone call.

28

1     The exclusion of a portion of Petitioner's police interview did not violate his rights

2 under the Confrontation Clause.   The state court's decision on this issue was a reasonable

3 application of federal law.

4     II.       Exclusion of Co Defendant's Testimony

5     Petitioner claims that the trial court's refusal to admit a portion of Sample's police

6 interview violated Petitioner's due process rights to present a complete defense and to a fair

7 trial.

8     The background is as follows:

9     Miller moved in limine to admit a portion of Sample's post-arrest police
interview in which Sample stated that he hit and kicked Trujillo in the ribs
10     after Trujillo was on the ground; that Torres hit Trujillo with the bat; that
Sample picked up the bat and ran with it; and that Sample did not recall Miller
11     doing anything during the attack. Miller argued that Sample's statements were
admissible as declarations against Sample's penal interest (Evid.Code, § 1230).
12     It was undisputed that for purposes of Evidence Code section 1230, Sample
was unavailable to testify.

13
     The trial court denied Miller's motion, ruling that Sample's statements
14     inculpating Torres and exculpating Miller were not against Sample's penal
interest and that his statements about his own participation were not
15     sufficiently reliable to warrant their admission "given the fact that [Sample]
subsequently under oath [at the hearing on his motion to exclude his pre- and
16     post-arrest statements to police] repudiated the entire statement." The trial
court cited Evidence Code section 352 as "an additional basis" for its ruling,
17     explaining that although Sample's statements about his own participation were
"extremely probative" of his own guilt, they had "little, if any, probative
18     value" with respect to Miller's guilt. That minimal probative value was
substantially outweighed by the probability that admission of the statements
19     would necessitate an undue consumption of time by "at least arguably"
requiring additional witnesses and testimony. The court noted that admission
20     of the statements would also create a substantial danger of confusing the
issues and misleading the jury.

21
*Sample*, WL 5460190 at 15-16.

22
     The California Court of Appeal rejected Petitioner's claim based on the following:

23
     Miller claims the trial court should have admitted Sample's post-arrest
24     statements as declarations against Sample's penal interests. We disagree.

25     Evidence Code section 1230 provides that "[e]vidence of a statement
by a declarant having sufficient knowledge of the subject is not made
26     inadmissible by the hearsay rule if the declarant is unavailable as a witness
and the statement, when made, ... so far subjected him to the risk of civil or
27     criminal liability ... that a reasonable man in his position would not have made
the statement unless he believed it to be true." (Evid.Code, § 1230.) "The
28     proponent of such evidence must show that the declarant is unavailable, that

13

the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610–611 (*Duarte*)). "We review a trial court's decision as to whether a statement is against a defendant's penal interest for abuse of discretion." (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).

Evidence Code section 1230 does not permit admission of " 'any statement or portion of a statement not itself specifically disserving to the interests of the declarant,' " and it does not apply to " 'collateral assertions within declarations against penal interest.' " (*Duarte*, supra, 24 Cal.4th at p. 612, quoting *People v. Leach* (1975) 15 Cal.3d 419, 441 (*Leach*).) "[C]ollateral statements are not made trustworthy by proximity to incriminating statements." (*Duarte*, at p. 617.) "Under the rule of Leach, a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' [Citations.]" (*Duarte*, at p. 612.) "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." (*Williamson v. U.S.* (1994) 512 U.S. 594, 599–600.) "Whether a statement is self-inculpatory or not can only be determined by viewing the statement in context." (*Lawley*, supra, 27 Cal.4th at p. 153.)

Here, Sample's statement that he "hit and kicked" Trujillo was inculpatory and specifically disserving of his penal interests because it implicated him in the fatal attack. (*Duarte*, supra, 24 Cal.4th at p. 611.) The same cannot be said about Sample's other statements, which seem to have been aimed at exculpating himself and Miller by shifting the blame to Torres. Sample did not admit inflicting any unquestionably fatal blows, and his statements that he picked up the bat after the attack and ran with it and that he could not recall Miller doing anything seem calculated to bolster the claim that it was Torres, rather than Sample or Miller, who killed Trujillo. Sample's minimization of his own role in the beating and the mere suggestion that Miller might not have participated render Sample's statements untrustworthy—a conclusion greatly bolstered by Sample's later admission under oath that all of his earlier statements were lies. Exclusion of the statements was not an abuse of discretion. (*Duarte*, at p. 612.)

Miller claims the trial court's overly strict interpretation of the Evidence Code violated his due process rights to a fair trial and to present a complete defense. The Attorney General counters that Miller forfeited the issue by failing to raise it below. Even assuming that Miller preserved his claim, it lacks merit.

The proper application of Evidence Code section 1230 did not violate Miller's due process rights. The excluded statements were hearsay to which no exception applied. (Evid.Code, § 1200; Duarte, supra, 24 Cal.4th at p. 610.) Sample had, moreover, declared under oath that he was lying when he made those statements. The statements were also flatly contradicted by Neri's eyewitness identification of Sample as the bat-wielding attacker and Miller as the attacker on the bicycle, by Torres's eyewitness testimony, and by the absence of any evidence (apart from Sample's and Miller's self-serving

14

1    statements to police) that Torres had joined in the attack. Exclusion of
     Sample's admittedly untrustworthy statements did not deny Miller due process.
2    *(Lucas, supra*, 12 Cal.4th at pp. 464–465; *People v. Hall* (1986) 41 Cal.3d
     826, 834–835.)
3
          The cases Miller relies on do not compel a different conclusion.
4    *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) and its progeny
     stand for the proposition that a state may not impede a defendant's right to put
5    on a defense by applying evidentiary rules "mechanistically to defeat the ends
     of justice." (*Chambers*, at p. 302; *Green v. Georgia* (1979) 442 U.S. 95, 97
6    (*Green*); *Su Chia v. Cambra* (9th Cir.2004) 360 F.3d 997.) They do not hold
     that a defendant must be allowed to present any evidence he chooses. In
7    noting that "[f]ew rights are more fundamental than that of an accused to
     present witnesses in his own defense," the *Chambers* court also declared that
8    "[i]n the exercise of this right, the accused, as is required of the State, must
     comply with established rules of procedure and evidence designed to assure
9    both fairness and reliability in the ascertainment of guilt and innocence."
     *(Chambers*, at p. 302.) In any event, the cases on which Miller relies are
10   distinguishable. In all of them, the excluded evidence "bore persuasive
     assurances of trustworthiness." (*Ibid.*; *Green*, at p. 97 ["substantial reasons
11   existed to assume [the] reliability" of the excluded evidence], *Su Chia v.
     Cambra*, at p. 1001.) Because that cannot be said here, those cases are
12   inapposite.

13   *Sample*, WL 5460190 at 15-17.

14        Sample's statement was properly excluded because it was untrustworthy. To begin

15   with, there is no dispute that the statement was hearsay. It was also not truly self-

16   inculpatory or against Sample's penal interests. As the state court explained, Sample's

17   statement was only partially self-inculpatory to the extent "he admits he hit and kicked" the

18   victim. (22 RT 2080: 26). However, Sample actually placed the blame for the murder on

19   Torres. As such, he deflected the blame for the more serious offense onto someone else.

20   While admitting to being present and participating, Sample strategically places the bat that

21   caused the death of the victim into the hands of Torres. Sample was denying guilt for the

22   murder and exculpating Petitioner at the same time. As such, his testimony does not carry

23   the trustworthiness of a statement that is purely against the declarant's penal interest. The

24   statement's lack of trustworthiness was later confirmed by the fact that Sample later

25   repudiated it when he testified under oath. (*Id.* at 2080: 22-25). In addition, the statement

26   was both uncorroborated and conflicted with two eye witnesses, Neri and Torres.

27

28

**United States District Court**
For the Northern District of California

15

1    Due to the untrustworthiness of Sample's statement the exclusion of evidence did not

2 violate Petitioner's due process rights.  The state's decision was a reasonable application of

3 federal law.

4    III.    Cumulative Effect

5    Petitioner argues that if no one of the above-described errors in itself requires

6 reversal of petitioner's conviction, the cumulative effect of the errors were so prejudicial

7 that his trial was rendered fundamentally unfair.  For the reasons discussed above, neither of

8 the claims resulted in any error at all.  As a result, there is no error or prejudice to cumulate,

9 let alone sufficient to amount to a constitutional violation.  Petitioner is not entitled to

10 habeas relief on this claim.

11                                **CONCLUSION**

12    For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  A

13 certificate of appealability will not issue.  *See* 28 U.S.C. § 2253 (c).  This is not a case in

14 which "reasonable jurists would find the district court's assessment of the constitutional

15 claims debatable or wrong." *Slack v. Mcdaniel,* 529 U.S. 473, 484 (2000).

16    The Clerk shall enter judgment in favor of the Respondent and close the file.

17    **IT IS SO ORDERED.**

18 DATED: July 30, 2015

19

20                                    _____

21                                    JEFFREY S. WHITE
                                      United States District Judge

22

23

24

25

26

27

28